Wash, J.,
dissenting.
I dissent from the foregoing opinion of the eonri. The re’-argument, with further research and reflection have but served to confirm the opinion I entertained on the first hearing of this cause. I shall not attempt a minute examination of the various questions which have been raised j the statement of them is full in the opinion delivered, and I will content myself with the outlines of the views then taken and which now lead meto a different conclusion from that to which the Court have come. Erom the most authentic histories, sacred and profane, ancient and modern, we learn that slavery in a more or less absolute state, has existed in all ages and nations since the deluge. That no condition, color, age or sex has ever been considered exempt from “the bitter curse.” That whilst the treatment and condition of slaves have been very different in different nations at the same period, and in the same nation at different periods of its existence, varying according to notions of policy or of natural rights; yet, that slaves have been always esteemed, and are at this day esteemed, the proper goods or property of their masters or owners, and to be sold, exchanged or bartered, as merchandize or other property, real or personal. It would be equally difficult and unprofitable to attempt to trace the origin of slavery, as to the time or manner of its introduction among the different nations of the earth. In looking to the civil law (from which Prance and Spain derive their system of jurisprudence,) we find it asserted by Justinian I, 155 that “Jure gentium serví nostri sünt, qui ab hostibus capiunter,” this was doubtless the most fruitful origin of slavery. It was regarded as the settled law of nations, that prisoners of war should he reduced to the condition of slaves. It was so practised upon by the Jews, Egyptians, Assyrians, Greeks and Romans — was so recognized and practised upon by the nations who overturned the Roman empire, and has been so recognized and practised upon by most if not by all of the nations of modern Europe. To say that nature, enlightened humanity and the pure principles of Christianity, cry out against slavery, is to talk not only without authority, but directly in the face of authority. Greece and Rome at the periods of their greatest learning and refinement, when at the height of their power and splendor, were then most remarkable for the number of their slaves and for the absolute dominion claimed and exercised' over them. It is out and out, from beginning to end, a pure question of power, individually, all men have equal rights to life, liberty and property. I'n communities or Governments, mere brute force oi- the physical strength of the majority as it is called, abridges or annihilates these rights at pleasure, what the despot or the-despotic will of the majority, through any other medium, decrees or permits, becomes the law of the land, and cannot be-resisted upon any other principle than that of rebellion, which assumes that the majority have, or soon will, or ought to revoke or change their decree, &c. Every independent nation or organized community judges for itself, and its judgment is final between those who belong to the nation or community and' cannot he interfered with by others, without affording just cause of war, if the injured party may choose to* think itself able to redress the wrong in that In the. *394 will of the monarch,Or of th.e majority is to he collected from what is permitted or tolerated, rather than from any express orders or decress.
It is also a principle of the civil law, that slavery may begin by a voluntary surrender of liberty;, and that by the law of nature, children bom of parents who are de facto slaves become ipso facto slaves themselves, “quia nascuntur servi” among the Greeks and Romans from whom we borrow much of our boasted learning' and refinement, a debtor unable to pay his debts, became the slave of his creditor; and criminals were sold to slavery or condemned to the oar. The Germans according to Tacitus, were so addicted to gaming, that when they parted with every thing sise, they would often stake their liberty and their persons; and the losers would become the voluntary slaves of the winners and be sold or exchanged away in commerce like other merchandize or property. I shall not attempt to note the great improvement made in modern times in these matters. It is certain that France and Spain have both asserted the right to enslave and hold in slavery. The property in a slave is to be placed upon the same footing, and to he lost, acquired or enjoyed, subject only to such municipal laws or regulations, as each nation may provide or prescribe for itself. The capture of the Iroquois chiefs by the French in Canada, see Raynal 48, and their reduction to slavery and the massacre in 1730, of the greater part of the Natchez nation and reduction of the residue to slavery, were as distinctly the acts of the French Government as if a royal proclamation had preceded or approved the deed. The evidence derived from the old archives of the country— the registers of baptisms and burials — the records of voluntary sales, and of the sales and distributions made of the estates of intestates, with the clear and positive testimony of witnesses sworn in this cause, exhibit beyond doubt or question, numerous cases of Indian slavery, commencing with the earliest settlement of the colony, and continuing after the period when the Spaniards assumed the government in 1769. The proclamation of O’Reilly, at the time the government was assumed by the Spaniards in 1769, and the decree of the Baron de Carondelet, in 1794, are proof to the same effect, and show expressly that the existence of Indian slavery de facto, was not only known to, but tolerated by the Spanish Government. The case of Seville and Chretian, cited from 3rd Martin’s Reports, was decided by very able Judges, and puts the question, as I think, upon its true ground. It is clear from the testimony in the cause, that the grandmother o£ the plaintiff was a woman of the Natchez tribe of Indians, taken a prisoner at the time that nation was massacred, captured and exterminated by Perier in 1730. Du Pratz and Marbois both state that the Natchez had acted in a manner so savage and perfidious as to make it necessary, in the estimation, of the French General, Perier,., to exterminate- them. They had indiscriminately murdered or reduced to slavery such of the French as fell into their hands, and upon the settled principles of the law of nations, might have been all put to the sword or rightfully reduced to slavery. The laws of nations, however, have never been regarded as applicable to the Indian tribes or nations of this continent. With them the general practice in war is to give no quarter, and whenever prisoners are taken they become the individual property of those who capture them, and are either sold, adopted into.thei? families, or held at their mercy.
All of the Natchez nation then, who were not put to death but were captured,, were therefore rightly reduced to slavery. Du Pratz informs us that those who es-carnecí the massacre, (with the exception of a few who fled to the Chickasaws,) were *395 all made slaves, and "that shortly afterwards those slaves were embarked for the Island of St. Domingo, in order that the nation should become extinct in the colony much stress has been laid on this statement of Du Pratz for two purposes, first, as evidencing a determination on the part of the Trench Government not to enslave Indians in the province of Louisiana, and second, to show that the maternal ancestor of the plaintiff could not have been one of those captured and enslaved. The main object of the historian was to state the fact that the Natchez nation was exterminated and the causes which, led to it, and it was not so material to state the precise means or manner of doing the thing. If such were not the case, however, the evidence in the cause is abundant to show, that the historical account of the matter as given by Du Pratz is not accurate, and that the maternal ancestor of the plaintiff was one of those captured at the time of the massacre, and was not sent to St. Domingo, or if so, was brought back and held in slavery in the province of Louisiana. Independent of the direct proof in the cause, the account given by Marbois in his history of Louisiana, of the destruction of the Natchez nation, is well calculated to sustain this view, he says, p. 119, “the Governor of the colony conceived that the insurrection (of the Natchez) required that a great example should be made ; and the tribe was exterminated with the exception of a few families who escaped the general massacre and were protected by the neighboring tribes. Prom time immemorial, the Natchez bad been governed by a family of chiefs whom they believed to be the children of the Sun. General Perier, the commanding officer, had them all carried away and transported to Cape Francois — the most important member of- the dynasty died there a few months after his arrival. The other Suns were maintained by the company for the moderate sum of 1,888 livres 7 sous. The company applied to M. Mau-repas to defray this expense. On the 22d April, 1731, the Minister wrote to the directors as follows : U am not aware that there is any other course to adopt in this matter than to order the survivors of these two Indian families to be sold or sent back to Louisiana.’ The registers of the company contain the following' resolution : eIt was resolved, to order the sale of the survivors of the said two families of Natchez Indians.’ ” Here the minister, whose duty it was to make known the will of the Sovereign, suggests the propriety of selling the Indians, and the company to whom the colony had Been transferred by letters patent, and who had charge of its settlement and government, in accordance wifh the suggestion, proceeded to sell the survivors as slaves. What recognition could he more full and explicit ? The slavery in this particular case was expressly sanctioned and legalized, and it need not he contended that the general practice or policy of the French in the American Colonies was to enslave the Indians; yet it seems to- me that the proof is sufficient to establish such practice and that too, with the full and clear knowledge and recognition of the Government. To regard the question then, as one to be settled by the laws which were in force prior to 1769, when Spain took possession of Louisiana, I can feel no doubt, and the practice is shown to have been pursued and recognized by the Spaniards, under neither of the governments that have preceded us, could the plaintiff have asserted successfully her claim to freedom. As property held and en - joyed by the permission and consent of the French and Spanish governments, it is contended, and I think rightly, that the owners of such Indian slaves, are secured and protected as-well by the law of nations as by the express stipulations of the treaty of cession to the United States.